803 So.2d 806 (2001)
Cameron TINDAL, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-2874.
District Court of Appeal of Florida, Fourth District.
December 19, 2001.
Rehearing Denied January 16, 2002.
Carey Haughwout, Public Defender, and Susan D. Cline, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Bart Schneider, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
This case involves appellant's highly contentious trial for first degree murder. Appellant complains that he was denied *807 a fair trial by the prosecutor's highly improper closing argument which included comments on facts not in evidence suggesting that a non-testifying witness made out of court statements exonerating appellant due to threats. We agree that the prosecutor's comments were so egregious and prejudicial as to require a new trial.
A grand jury indicted Cameron Tindal, appellant, and Randy Garland, the co-defendant, for committing the first degree murder of Marvin Mack, the victim. After their first trial resulted in a hung jury, the case proceeded to a second jury trial, which developed the following facts.
On December 27, 1998, an altercation occurred at a store near Lennox Apartments involving Michael Young. Someone shot at Michael Young and other people sprayed Young's brother, Tavares, with mace. Michael Young is Garland's cousin, and both men are nephews of Tony Hayes. The next day Hayes, appellant, and Garland drove together to the Lennox Apartments. Appellant and Garland went up to the store where the fight had occurred the previous night. Hayes testified that he went down the street.
Meanwhile, the victim Mack was sitting on a wall near the store with longtime friend, Aaron Robinson. Robinson, a three time convicted felon, testified that appellant and Garland, both wearing dark jackets, walked towards them. Appellant pulled out a gun, pointed it at the victim and Robinson, and shot. Robinson fell off the wall and ran away, hearing two or three more shots. Returning to the scene fifteen minutes later, Robinson found the victim dead.
Hayes, still down the street, heard gunshots and saw the victim running away from the store, followed by Garland and appellant. The victim fell to the ground, and according to Hayes, appellant shot the victim twice. Appellant and Garland then ran away, even though Garland had the keys to Hayes' car. Hayes also testified that he received a series of cell phone calls about fifteen minutes later from appellant and Garland asking whether the victim died. When Hayes found out that the victim was dead and informed appellant and Garland, they told him they were leaving town.
After hearing the gunshots, John Hope, a resident of Lennox Apartments, observed appellant and Garland walking through a path toward him. They asked him for a ride, as Hope frequently gave rides to make additional money. Hope agreed, and they left in Hope's car. During the ride, Hope heard appellant say "[w]e just had to shoot the fool." Hope also saw appellant and Garland pass a gun between them.
Back at the crime scene, Officer Paul Ostrikis was the first officer to arrive. He gathered information from individuals, including Diane Wilsure. In his report, he wrote that she identified Hayes as the gunman. The officer provided his report to lead detectives Walley and Stone.
The lead detectives took sworn statements from Hayes and Michael Young on the evening of the murder. They also ordered gunshot residue swabs of both men. The detectives stated that they ordered them as part of a thorough investigation, even though they said that Hayes was not a suspect. In his statement to police, Hayes named Randy Gardner and Justin Carver as the culprits and stated Carver was dressed all in white that night. Hayes explained at trial that Justin Carver is appellant. Even though Hayes knew both appellant and Garland well, he never called them by their correct names during the statement. Hayes also never told the police about the phone calls he received from them that night.
A couple of days after the shooting, Hope came forward and spoke to the police *808 because he heard that he might be a suspect. His statement to the police was consistent with his trial testimony recited above. About a month after the murder, the police approached Robinson, and his statement also was similar to his trial testimony, identifying appellant and Garland as the culprits. He explained that he did not talk to the police before because he was afraid.
The prosecution's case consisted of testimony from Hayes, Hope, and Robinson, together with the medical examiner, crime scene technicians, and a gun expert. The prosecutor did not call any of the investigating officers. They were called by the defense, including Walley and Ostrikis. The purpose of calling the officer and detective was to attack the thoroughness of their investigation, particularly the fact that Officer Ostrikis had a witness who had identified Hayes as the shooter even though Detective Walley testified that no one ever pointed to Hayes as a suspect.
During his initial closing, the prosecutor argued the following, without objection:
He [Officer Ostrikis] talks to four people. Puts them down in his report. And you find out through the testimony, through cross examination and direct, he finds out from one witness a person named Tony was involved. He writes that in his report. He doesn't know who this person is. He didn't take a sworn taped statement from them. He can't spend a lot of time with this person. He doesn't know why that person is saying it. And you shouldn't speculate. That person didn't testify, you don't know whether that person was intimidated or in fear when she said that, whether she had a gun pointed at her. You can't speculate. You don't know.
Later, he argued:
But immediately after collecting it [gunshot residue swabs], almost immediately, their sworn statements started coming in, those sworn statements and those photographic lineups, and they [the detectives] learn very quickly after that point who did this killing. They learn very quickly from the physical evidence and the testimonial evidence that Garland and Tindal, they shot a human being dead with a gun. They were responsible. They didn't just close up shop though, when they knew that. They continued doing their job day after day on this case. Even to a month later taking sworn statements from witnesses. Tracking them down. Taking those statements. They knew early on who did this crime, but that didn't stop them. They continued doing their job.
You heard throughout this whole trial about this gunshot residue test. And you heard from Walley why they didn't send it up. He told you "They're just not reliable and we already knew we had the people who committed this crime. There was not a shred of evidence otherwise."
This fantom person who is alive, a real person who talked to Officer Ostrikis, who said something to Officer Ostrikis about Tony, that person didn't testify here. The defense subpoenaed in three witnesses. Officer Ostrikis and two detectives. You all agreed that you wouldn't speculate. You wouldn't come up with possibilities. You would base your decision of following the law on the evidence that comes in this trial. In this trial.
Detective Walley told you they got a hold of the woman who spoke to Officer Ostrikis. And they took a sworn statement from her. And they knew exactly what she had to say and why she had to say what she did before. But there is *809 no testimony before you as to what that was. And you all agreed you would follow the law.
Don't speculate.
During appellant's counsel's closing, he argued:
I wanted you to hear that Ostrikis spoke to a woman out there at the scene, a woman named Diane. And what did Diane tell him? Not thatwhat did Mr. Padowitz [the prosecutor] say"He found that Tony was involved"? Bull.
Diane told Officer Ostrikis "A black male by the name of Tony was the gunman." Not that "He was involved." The gunman. All right.
Well, Detective Walley, Detective Stone, get the gunman at the station that night, and what do they do. They take gunshot residue tests. Why? Detective Stone. Detective Walley. "He was never a suspect." You buy that? You buy that? Why take gunshot residue tests if he is not a suspect?
Why does Ostrkis tell them "A witness, an eye witness, Diane, told me he is the gunman"? Why? And why do I have to present that stuff to you? Why doesn't the state? Use your common sense.
He continued, arguing why the jury should find a reasonable doubt:
Number 1, the fact that defense had to call the lead detective in this case, that should really concern you. Your common sense should tell you there is something wrong here.
The fact that the defense had to call the first officer on the scene that spoke to witnesses should put up a red flag in your mind. There is something wrong here. Why isn't it presented to you by the state?
. . . .
It should absolutely offend you that Officer Ostrikis is told "A black male by the name of Tony", the only Tony mentioned in this case, Tony Hayes, "was the gunman" and yet two detectives could come in here and tell you, look you in the eye and tell you "Tony Hayes was never a suspect."
Bull. That is what that is. That is a bald faced lie. That shouldthat in and of itself should concern you. That is clearly a conflict in the evidence.
In the prosecutor's rebuttal, he addressed Wilsure again and said:
Mr. Hammer called Detective Walley a liar because Detective Walley said that there is not a shred of evidence about Tony Hayes being a suspect.
Detective Walley had the benefit of doing an entire investigation. Detective Walley, you found out, had the benefit of talking to Diane Wilsure and taking a sworn statement from her. You don't know what she said. You can't speculate if she told Detective Walley that a gun was pointed at her and she was in fear.

(Emphasis added). Appellant immediately objected and moved for a mistrial on the ground that the prosecutor had introduced a highly prejudicial statement which was not in evidence. The prosecutor argued that it was a reasonable inference from Detective Walley's testimony that there was not one shred of evidence pointing to Hayes as a suspect. He argued that Detective Walley could have determined that Wilsure was a witness in fear and not reliable.
To its credit, the court determined that it was not a reasonable inference from the testimony that a gun was pointed at Wilsure when she made the statement to Ostrikis. However, the court determined that it did not rise to the level of requiring a mistrial because what the lawyers say is *810 not evidence. The court offered to give any curative instruction which the defense could think of, but the defense maintained that the prejudicial effect of the prosecutor's comment could not be cured. The court then simply told the jury that what the lawyers say is not evidence and that they should rely upon what they heard from the witness stand. Overall, the court instructed the jury at least eleven times during the course of closing arguments that what the lawyers say is not evidence.
The jury found both appellant and Garland guilty of first degree murder. The court denied appellant's renewed motion for mistrial, adjudicated appellant guilty, and sentenced him to life without parole. This timely appeal followed.
While appellant points to several objectionable comments that the prosecutor made during closing argument, we focus on the comments regarding witness Wilsure. The state's suggestion that Wilsure identified Hayes as the gunman because she had a gun pointed at her substantially undermined the defense, implied that the prosecutor had information which was not presented at trial, suggested that the defendants may be threatening the witness, and was so prejudicial as to require a new trial.
This court has repeatedly held that it is impermissible for the state to suggest, without evidentiary support, that the defense has "gotten to" and changed a witness's testimony or that a witness has not testified out of fear. See Johnson v. State, 747 So.2d 436, 439 (Fla. 4th DCA 1999); Henry v. State, 651 So.2d 1267, 1268-69 (Fla. 4th DCA 1995). In this case, there was no evidentiary support for the prosecutor's comment that Wilsure failed to testify out of fear or made her initial statement because someone threatened her. The state correctly concedes that the comments were improper. It attempts to justify them by noting cases where the prosecutor has been permitted to comment on a non-testifying witness who the defense injects into the proceedings. See, e.g., Love v. State, 569 So.2d 807, 810-11 (Fla. 1st DCA 1990). While appellant may have injected Wilsure into the proceedings, that does not justify the prosecutor's suggestion that Wilsure was intimidated or threatened. First, because the prosecutor is an agent of the state, such comments imply that the prosecutor has unique knowledge that has not been presented to the jury. See generally Martinez v. State, 761 So.2d 1074, 1081 (Fla.2000) (citing United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Second, the comment was "highly irregular, impermissible, and prejudicial" because it improperly implied that appellant engaged in witness tampering or suborning perjury, both criminal offenses. Henry, 651 So.2d at 1268. Thus, the prosecutor's comments went beyond a fair reply.
Because the court gave a curative instruction that what the lawyers say is not evidence, the state suggests that the comments were cured. Such an instruction was held to cure any error in United States v. Martinez, 981 F.2d 867, 871 (6th Cir.1992), cited by the state. However, the improper comment in Martinez involved the prosecutor "vouching" for a police officer and informing the jury of his long service. The court concluded that the "isolated misstatement" was a slight impropriety which was cured by the instruction. Id. Schwarck v. State, 568 So.2d 1326, 1327 (Fla. 3d DCA 1990), also cited by the state, determined that a "strong curative instruction" removed any taint from the improper comment, but because the opinion does not detail what the improper comment was, we cannot evaluate whether the comment was a slight impropriety or amounted to major misconduct. *811 Del Rio v. State, 732 So.2d 1100, 1102 (Fla. 3d DCA 1999), noted that prejudicial arguments which are inflammatory are inappropriate but when accompanied by curative instructions, may not necessarily deprive the defendant of a fair trial. Similarly, Williams v. State, 754 So.2d 724, 726 (Fla. 4th DCA 1999), concluded that a state comment which impermissibly shifted the burden of proof by suggesting that the defendant had an expert which he failed to call was error, but the court gave a curative instruction and the error was not so prejudicial as to warrant granting the motion for mistrial.
In this case, the comments were neither slight nor isolated. Appellant's strategy was to focus on the inconsistencies in the alleged eyewitnesses, their lack of credibility, and that the investigation was sloppy and did not investigate all suspects. Wilsure's statement to Officer Ostrikis was the prime example of such lack of investigation because the lead detective testified that there was no evidence anyone else was a suspect even though Wilsure had told the officer that Hayes was the gunman. The prosecutor's comments implied the statement accusing Hayes was made out of fear and, therefore, not reliable. This destroyed a central theme of appellant's defense without the prosecutor having any admissible evidence to support the inference. In Henry, when the prosecutor argued someone "got to" a witness, we noted that such a comment is "highly irregular, impermissible, and prejudicial." 651 So.2d at 1268. We can say the same thing here, too. The curative instruction was insufficient to erase the prejudice, particularly when the same one was given at least ten other times in the course of closing argument. The trial court abused its discretion in failing to grant a mistrial.
Appellant also contends that the trial court should have admitted the results of the gunshot residue tests into evidence. We do not need to decide the evidentiary claim made because any failure to admit the test results was harmless. The results of the report were discussed many times by many witnesses, and the jury was made aware of the essential facts included in the report.
For the foregoing reasons, we reverse and remand for a new trial.
POLEN, C.J., and GUNTHER, J., concur.