926 So.2d 1118 (2006)
Seth PENALVER, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1602.
Supreme Court of Florida.
February 2, 2006.
Rehearing Denied April 7, 2006.
*1122 Carey Haughwout, Public Defender and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Melanie Dale Surber, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court finding Seth Penalver guilty of three counts of first-degree murder and imposing sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we reverse and remand for a new trial.

FACTS AND PROCEDURAL HISTORY
On Sunday, June 26, 1994, a Palm Beach County police officer discovered a Mercedes SL convertible on fire on a road twelve miles south of South Bay. The car was registered to Casmir Sucharski.[1] The officer who discovered the car notified the Miramar Police Department, and a Miramar police officer went to Sucharski's home to tell him that his car had been discovered. The officer knocked on the door and received no answer. The officer saw nothing unusual. He stuck his card in the door and left.
Meanwhile, early on the morning of June 27, 1994, Margaret Edwards contacted the Broward County Sheriff's Department and reported her daughter, Marie Rogers, as a missing person. Edwards *1123 said her daughter went to a nightclub called Casey's Nickelodeon on Saturday night, June 25, with a friend, Sharon Anderson, and had not returned home. Casmir Sucharski owned the nightclub. Deputy Christopher Schaub went to the nightclub and learned that Sucharski left the club early Sunday morning, June 26, with Rogers and Anderson. Deputy Schaub drove by Sucharski's residence around 2:06 a.m. on Monday. Anderson's car was in the driveway, but no one answered the door. Deputy Schaub found a Miramar Police Department business card in the door and a blue T-shirt on the porch. He peered inside, saw three bodies, gained access to the house, and called for backup. The police identified the individuals found at the residence as Sucharski, Anderson, and Rogers. All three victims had died of gunshot wounds. The murders were captured by a video surveillance camera which had been installed in Sucharski's residence a week before the murders. The videotape revealed that on Sunday, June 26, 1994, at 7:18 a.m., two men entered through the back sliding door of Sucharski's home. One of the intruders had something covering his face and head, and the other intruder wore a baseball cap and sunglasses. The intruder with the cap and sunglasses moved throughout the residence while the other intruder stayed with the victims. Sucharski was hit in the face with a Tec-9 gun, knocked to the floor, and beaten on his neck, face, and body by the intruder in the sunglasses and baseball cap. Sucharski was beaten for nearly twenty-two minutes. The intruder with the face covering, later identified as Pablo Ibar, shot Anderson, Rogers, and Sucharski in the back of the head, after which the other intruder shot Anderson and Sucharski in the back.
The police took frames from the videotape and produced a flyer that was sent to law enforcement agencies. Three weeks after the murder, the police received a call from the Metro-Dade Police Department that it had an individual in custody who resembled an individual on the flyer. That individual was Pablo Ibar. Penalver was identified by his friend, Jean Klimeczko,[2] as the other intruder involved in the murder. Subsequently, Melissa Munroe, Ian Milman, and Kimberly San, each of whom were acquainted with Penalver and Ibar, also identified Penalver as the other intruder on the videotape.
On August 25, 1994, Penalver and Ibar were each charged with three counts of first-degree murder, one count of burglary, one count of robbery, and one count of attempted robbery. The first jury trial ended in mistrial due to a hung jury. The second jury trial ended with Penalver being found guilty on all charges.
After a penalty phase proceeding, the jury recommended death by a unanimous vote, and the trial court imposed a death sentence after finding the following statutory aggravators: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of a robbery or burglary; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the capital felony was especially heinous, atrocious, or cruel (HAC); and (5) the capital felony was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification. Although the court found that the aggravating factor that the capital felony was committed for pecuniary gain *1124 was proven beyond a reasonable doubt, the court's finding that the capital felony was committed while the defendant was engaged in the commission of a robbery or burglary precluded it from considering this factor as it would constitute doubling of the aggravating factors.
Penalver's counsel argued for and requested that the trial court consider numerous mitigating factors, including: (1) Penalver's troubled personal history, which included his failure to thrive, drug addiction at birth, mental illness, status as a special education pupil, learning disabilities, marginal intelligence, susceptibility to bad advice from peers, personality disorders, isolation, psychological stress, emotional instability, social alienation as a child, impoverished background, cultural deprivation, denial of emotional responsiveness, drug abuse and addiction, and alcohol abuse and addiction; and Penalver's family background which included the failure of his caretakers to provide for him, medical, mental health and educational neglect, exploitation by his parents, psychological maltreatment, rejection and degradation by his parents, and a history of institutionalization of family members; (2) he was twenty-one years old at the time of the crime; (3) he was an accomplice in the crime and his participation was relatively minor; (4) he has demonstrated a good attitude and demeanor over the past six years in custody; (5) he voluntarily turned himself in to the police after he was made aware that a warrant had been issued for his arrest; (6) he was under the influence of alcohol at the time of the homicides; (7) he has performed good deeds and exhibited good personality characteristics; and (8) he has unwaveringly declared his innocence. Although Penalver refused to allow this evidence to be presented to the jury, the trial court considered whether any of the evidence at trial supported these areas of mitigation. The trial court found one statutory mitigating factor: Penalver's age at the time of the offenses was twenty-one. The court gave this factor little weight. Additionally, the trial court found and weighed four nonstatutory mitigating factors: (1) the defendant's good attitude and demeanor as demonstrated over the past six years in custody; (2) the defendant voluntarily turned himself in to the police; (3) the defendant's use of alcohol on the day of the offense; and (4) the defendant's good deeds to others. However, the trial court determined that these factors did not outweigh the aggravating circumstances, and the trial court sentenced Penalver to death on the three counts of first-degree murder, to life in prison for burglary and robbery, and to fifteen years for attempted robbery.
Penalver raises twenty-two issues on appeal: (1) whether the introduction of an out-of-court statement as proof of subsequent conduct under section 90.803(3)(a)(2), Florida Statutes (1999), denied Penalver his right to confrontation, due process, and a fair trial under the Florida and United States Constitutions; (2) whether the trial court erred in admitting irrelevant evidence that Melissa Munroe had conversations with Penalver's attorney; (3) whether the trial court erred in admitting irrelevant jail records; (4) whether the trial court erred in allowing Detective Paul Manzella to testify that he did not believe what Ibar told him about where he was at the time of the murders; (5) whether the trial court erred in permitting Detective Manzella to describe specific consistent facts that Jean Klimeczko and Ian Milman had told him; (6) whether the trial court erred in admitting evidence that Penalver's refusal to relinquish his shoes to the police was evidence of his consciousness of guilt; (7) whether the trial court erred in admitting statements from Penalver to Melissa Munroe as evidence of consciousness *1125 of guilt; (8) whether the trial court erred in allowing a State witness to give opinion testimony beyond his expertise; (9) whether Penalver was denied due process and a fair trial due to prosecutorial misconduct; (10) whether the trial court erred in admitting hearsay statements of Jean Klimeczko as to what allegedly occurred on the weekend of the killings; (11) whether the trial court erred in admitting hearsay opinions of Melissa Munroe and Jean Klimeczko that Penalver was the person in the photo taken from the videotape of the murder; (12) whether the trial court erred in prohibiting Penalver from introducing to the jury a taped conversation between Casmir Sucharski and his ex-girl-friend, Kristal Fisher; (13) whether the trial court erred in admitting hearsay statements from Jean Klimeczko over Penalver's objection; (14) whether the evidence was insufficient for conviction when the only evidence of guilt was the out-of-court statements; (15) whether the trial court erred in overruling Penalver's hearsay objection to out-of-court statements by Kimberly San that she had told others that Penalver was involved in the murders; (16) whether Penalver was denied his rights to confrontation, due process, and a fair trial when the prosecution introduced the former testimony of Ibar's mother, Maria Casas, in order to admit hearsay opinion testimony; (17) whether Penalver was denied his right to confrontation, due process, and a fair trial when the prosecution called witnesses in order to admit their out-of-court statements that would otherwise have been inadmissible; (18) whether the trial court erred in admitting out-of-court statements of Kimberly San regarding why she came forward with information after the murders; (19) whether the trial court erred in prohibiting the deposition of Herschel Kinnaman, Kimberly San's father, from being read into evidence; (20) whether Penalver's death sentence violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (21) whether the death penalty in this case is unreliable due to errors in the sentencing proceeding; and (22) whether the trial court erred in prohibiting consideration of residual doubt as a mitigating circumstance. We discuss these issues below. As there is overlap among many of the issues and the law pertaining to the issues, we group some together in our discussion.
Because we find that the trial court erred in several of its evidentiary rulings, we vacate the judgments and sentences imposed and remand for a new trial.

LAW AND ANALYSIS
Because all of the evidence presented in Penalver's trial is important to our analysis of the issues Penalver raises in this appeal, we set forth the following additional, pertinent facts from the record of the trial. In this case, there was no physical evidence presented that tied Penalver to the crime. The primary source of evidence in this case is the videotape taken at the scene of the crime that depicts the murders. The individual on the tape that some of the witnesses have identified as Penalver has on a hat and sunglasses during the crime. Those items are never removed; therefore, much of the perpetrator's face is concealed. After reviewing the tape, we conclude that it is difficult to determine whether Penalver is the individual with the hat and sunglasses. In contrast, the other individual on the tape, identified as Ibar, takes off his disguise during the crime. Dr. Mehmet Iscan, an expert in forensic anthropology,[3] testified *1126 that because of the poor quality of the video and the lighting conditions, he could not reach a positive conclusion about whether the individual in the video was Penalver. Dr. Iscan noted that there were discrepancies in the lower half of the face which led him to lean to a conclusion that the individual on the tape was not Penalver.
Due to the inconclusiveness of the videotape and the lack of other physical evidence connecting Penalver to the crime, the witnesses' statements presented at trial were of paramount importance. In out-of-court statements, Melissa Munroe and Jean Klimeczko identified Penalver as one of the individuals depicted on the tape. However, these witnesses testified at trial that the videotape was of such poor quality that they could not positively identify the men shown. Other witnesses familiar with Penalver testified that he was not the person in the videotape. Although Kimberly San opined at trial that Penalver was the individual on the videotape, she acknowledged that she could not identify the face in the video and photos because the face was too blurry. San instead relied on the way the intruder walked and placed the gun in his trousers, but was unable to explain or describe what made these movements distinctive and recognizable as belonging to Penalver.
We note there was other evidence presented at trial. Gary Foy, Sucharski's neighbor, testified that on the morning of the murders he saw two white or Latin men in Sucharski's black Mercedes. Foy identified Pablo Ibar as one of the individuals in the car. Chris Bass testified that while waiting in a holding cell he overheard Penalver tell Ibar, "My lawyer says I got a shot because I didn't take my mask off, you did." David Phillips, a friend helping Kimberly San move on the weekend of the murders, testified that he saw Penalver and another man at her house in a black Mercedes. San testified that Penalver "said something to the fact that he had to go out and kill somebody to get some money." Additionally, San testified that on the morning she was moving, Penalver and Ibar were at her house in a black Mercedes. However, after considering the admissible and inadmissible evidence presented at trial, we conclude that the errors made by the trial court warrant reversal in this case because we cannot say that these errors did not contribute to the finding of guilt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

I.

ADMISSION OF HEARSAY TESTIMONY BY IAN MILMAN
As his first claim, Penalver contends that the trial court improperly allowed Ian Milman, one of Penalver's roommates, to testify that another roommate, Alex Hernandez, stated his intention to travel to North Carolina the weekend of the murders. Penalver argues that this testimony is hearsay, not admissible under the hearsay rule, and not an exception to the hearsay rule. Defense counsel timely objected to this testimony, arguing that it was not relevant because there was no proof that Hernandez actually went to North Carolina. The State argued that this evidence was relevant because the defense identified Hernandez as a potential *1127 perpetrator of the crime. Thus, the testimony was relevant to show that Hernandez was not in town when the murders occurred. The trial court allowed Milman's statement into evidence as an exception to the hearsay rule under section 90.803(3) (1999), Florida Statutes, which provides:
(3) THEN-EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION.
(a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
(b) However, this subsection does not make admissible:
1. An after-the-fact statement of memory or belief to prove the fact remembered or believed, unless such statement relates to the execution, revocation, identification, or terms of the declarant's will.
2. A statement made under circumstances that indicate its lack of trustworthiness.
§ 90.803(3), Fla. Stat. (1999).
A hearsay statement of intent or plan is admissible under section 90.803(3) when offered to "[p]rove or explain acts of subsequent conduct of the declarant." § 90.803(3)(a)(2), Fla. Stat. (1999). See also Charles W. Ehrhardt, Florida Evidence, § 803.3b, at 788 (2005 ed.). In this case, the statement that Hernandez planned to go to North Carolina was offered to prove that he subsequently went to North Carolina. While this is the kind of testimony contemplated by the rule, such a statement is only admissible if there is other sufficient evidence to draw the inference that the act or plan was executed.
Several modern Florida cases discuss this hearsay exception and shed light on its application. In Muhammad v. State, 782 So.2d 343, 359 (Fla.2001), a mother testified that she was talking on the phone to her son when he was killed. The State asked the mother what the son was talking about, and the mother said that he was on his way to the courthouse to get a business license and that he was excited about his future. This Court indicated that the evidence was inadmissible because the son's statement was not offered to prove he subsequently went to the courthouse, it was offered to prove that he was excited about his future, and this would garner sympathy from the jury. Thus, the admission of the statement fell outside of the purpose of the rule, i.e., to prove a subsequent act. Likewise in Brooks v. State, 787 So.2d 765 (Fla.2001), the State introduced a hearsay statement made by the victim that she was going to Crestview with her boyfriend who was not the defendant Brooks. This Court found that statements of intent under this exception are only admissible to infer the future act of the declarant, not the future act of another person. Id. at 770-71. Thus, the victim's statement of intent to go to Crestview with her boyfriend could only be used to show she went to Crestview with her boyfriend. It was inadmissible because the evidence was offered to show that the defendant followed the victim and her boyfriend to Crestview. See id.
In contrast, this Court in Monlyn v. State, 705 So.2d 1 (Fla.1997), found a hearsay statement made by the defendant to a fellow inmate to be admissible under this *1128 hearsay exception. In Monlyn, Johnny Craddock, Monlyn's fellow inmate, testified that on the day before Monlyn escaped from jail, Monlyn told him that he was going to escape, get a shotgun, and kill the first person he saw with a car. In affirming the trial court's denial of Monlyn's motion to suppress the statement, we said, "This is exactly the kind of evidence contemplated by section 90.803(3)(a)2, Florida Statutes (1995), as satisfying the state of mind exception to explain subsequent conduct." Monlyn, 705 So.2d at 5.[4]
These cases illustrate that statements admitted under the state of mind exception to the hearsay rule are properly admitted only if they involve the state of mind of the declarant and there is evidence demonstrating that the declarant acted in accord with the state of mind or intent. In this case, Hernandez's state of mind, his "intention" to go to North Carolina, is relevant to the intermediate issue of whether he was in town and could have committed the murders. If there is sufficient evidence to draw the inference that he went to North Carolina to attend his nephew's communion, and the evidence is offered for that purpose, then the evidence would be admissible. The only evidence offered by the State in this case is Milman's testimony that Hernandez returned home on Sunday and the hearsay statement made by Hernandez to Milman about taking a plane home. There is nothing else in this record to draw the inference that Hernandez actually went to North Carolina. See, e.g., Monlyn, 705 So.2d at 3 (indicating evidence supporting the conclusion that Monlyn committed the acts expressed in the hearsay statement). Here, however, the gap between the intention and whether the act was in fact done is too great to support an inference that Hernandez was in North Carolina at the time the murders were committed. Thus, the trial court should not have admitted the evidence under the state of mind exception to the hearsay rule.

II.

CONVERSATIONS WITH DEFENSE COUNSEL AND JAIL RECORDS OF DEFENSE COUNSEL'S VISITS
Penalver also alleges that the trial court erred in admitting irrelevant evidence that Melissa Munroe had conversations with Penalver's attorney, Glenn Roderman. At trial, defense counsel argued that this evidence was irrelevant because the State would impermissibly imply that Munroe changed her testimony after speaking with Roderman. Defense counsel further argued that the State should not be allowed to imply that Roderman acted unethically by telling Munroe about a video that was the object of a gag order, because there was no evidence that Roderman violated the order.[5] The State asserted that the jury could draw the inference as to whether Munroe's testimony could have been influenced or affected by the conversations she had with Roderman. After a lengthy sidebar, the trial court admitted the evidence.
Thereafter, the State asked Munroe whether she had conversations with Roderman. Munroe testified that she had several conversations with Roderman and went to his office, but she did not know *1129 how many times. When asked how long the conversations continued, Munroe said she was not sure, but she knew they lasted more than one week. The State then asked Munroe questions concerning the substance of her conversations with Roderman. Munroe repeatedly stated she could not remember the substance of the conversations; however, she indicated that she thought the conversations were about general information regarding the case. After another lengthy sidebar, the State asked Munroe whether she had telephone conversations with Roderman. Munroe testified that she had more than one telephone conversation with Roderman, but she had no idea how many.
Penalver also argues that the trial court erred in admitting irrelevant jail records. The State argues that the jail records of visits to Penalver from his subsequent attorney Tim Day were relevant to establish when Penalver found out that a photo had been enhanced from the videotape. Although the State never expressly stated that Day passed information on to Munroe, the State contends that it was attempting to prove that Munroe changed her testimony after she learned that her identification of Penalver from the videotape photo placed him at the crime scene. At trial, defense counsel objected to the admission of the jail records as irrelevant, arguing that the records only supported a series of speculative inferences about the actions of Penalver and his attorney. The trial court overruled Penalver's objection and allowed the records into evidence.
In closing argument, defense counsel challenged the State's theory concerning Munroe's conversations with Roderman and the jail records which detailed Penalver's visits with Day. In rebuttal, the State implied that defense counsel improperly influenced Munroe's testimony. The State pointed out that Munroe initially identified the individuals from the video as Ibar and Penalver. At the grand jury hearing on August 25, Munroe equivocated, stating that it merely looked like Ibar and Penalver were the individuals on the videotape. The State implied that Munroe's testimony changed due to information she had received from Day:
I submit to you, with respect to the August 25th hearing, take a look at what I introducedthe last things I introduced, State's Exhibit 263, 263[sic], visitation records of the lawyers on the 22nd of August. Mr. Tim Day took over as attorney for Mr. Penalver. He was the attorney to follow Roderman, and he was under no order.
. . . .
Melissa Munroe told you that she was in touch with Seth Penalver, spoke to him. He's got constant daily communication with a lawyer who's under no order, visiting him every day. . . .
Generally, comments by the State implying that the defense tampered with a witness without evidentiary support constitute reversible error. See, e.g., Cooper v. State, 712 So.2d 1216, 1217 (Fla. 3rd DCA 1998); Tran v. State, 655 So.2d 141, 142 (Fla. 4th DCA 1995); Jones v. State, 449 So.2d 313, 314-315 (Fla. 5th DCA 1984). Penalver cites the Fourth District Court of Appeal's decision in Tindal v. State, 803 So.2d 806 (Fla. 4th DCA 2001), as support for his argument. In Tindal, the State argued that a witness failed to testify regarding the identity of the triggerman in a murder because someone threatened her. In finding that the State's statement constituted reversible error, the Fourth District said:
This court has repeatedly held that it is impermissible for the state to suggest, without evidentiary support, that the defense has "gotten to" and changed a witness's testimony or that a witness has *1130 not testified out of fear. See Johnson v. State, 747 So.2d 436, 439 (Fla. 4th DCA 1999); Henry v. State, 651 So.2d 1267, 1268-69 (Fla. 4th DCA 1995). In this case, there was no evidentiary support for the prosecutor's comment that Wilsure failed to testify out of fear or made her initial statement because someone threatened her. The state correctly concedes that the comments were improper. It attempts to justify them by noting cases where the prosecutor has been permitted to comment on a nontestifying witness who the defense injects into the proceedings. See, e.g., Love v. State, 569 So.2d 807, 810-11 (Fla. 1st DCA 1990). While appellant may have injected Wilsure into the proceedings, that does not justify the prosecutor's suggestion that Wilsure was intimidated or threatened. First, because the prosecutor is an agent of the state, such comments imply that the prosecutor has unique knowledge that has not been presented to the jury. See generally Martinez v. State, 761 So.2d 1074, 1081 (Fla.2000) (citing United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Second, the comment was "highly irregular, impermissible, and prejudicial" because it improperly implied that appellant engaged in witness tampering or suborning perjury, both criminal offenses. Henry, 651 So.2d at 1268. Thus, the prosecutor's comments went beyond a fair reply.
Tindal, 803 So.2d at 810. We agree with the reasoning of the Fourth District. The instant case is similar to Tindal because the State intimated that Munroe changed her testimony because the defense had "gotten to" her.
Furthermore, we find that both Munroe's testimony regarding her conversations with Penalver's attorney and the jail records detailing Penalver's visits with his attorney were irrelevant and prejudicial. See § 90.401, Fla. Stat. (1999) ("Relevant evidence is evidence tending to prove or disprove a material fact."). Evidence that Munroe had conversations with Penalver's attorney is irrelevant because standing alone it does not support the argument that Munroe changed her testimony at trial based on these conversations. In fact, as Penalver contends, this entire line of questioning could have suggested to the jury that Penalver or his attorney exerted pressure on Munroe to change her testimony. Such a suggestion made without evidentiary support undermines one of the foundations on which our criminal justice system is premised: equal access by the State and the defense to witnesses.
It is a longstanding principle that witnesses in a criminal prosecution are not the property of the State or the defense. Both sides have an equal right and should have an equal opportunity to interview and talk to witnesses. See United States v. Long, 449 F.2d 288 (8th Cir.1971). The United States Court of Appeals for the District of Columbia Circuit opined:
[T]here seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to . . . . "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party."
Gregory v. United States, 369 F.2d 185, 188 (D.C.Cir.1966) (quoting Canons of Prof'l Ethics Canon 39 (1937)). If the prosecutor is allowed to imply that counsel's interviews with the witness are improper, the defense's right to interview the witness becomes illusory.
Furthermore, the jail records detailing Penalver's visits with his attorney were *1131 irrelevant because it is well settled that a criminal defendant has a constitutional right to consult with counsel prior to and during trial. See, e.g., Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989); § 901.24, Fla. Stat. (1999) ("A person arrested shall be allowed to consult with any attorney entitled to practice in this state, alone and in private at the place of custody, as often and for such periods of time as is reasonable."). Additionally, "the right to a private interview by a person accused of crime with his lawyer prior to trial is a valuable right, and it is the duty of the court to jealously guard the accused from deprivation thereof." Coplon v. United States, 191 F.2d 749, 758 (D.C.Cir. 1951) (quoting Hughes v. Cashin, 184 Misc. 757, 54 N.Y.S.2d 437, 441 (N.Y.Sup. Ct.1945)). If we allow the prosecutor to make negative implications when the defendant meets with counsel, the right to counsel becomes illusory. It is not inconceivable that during preparation for trial, defense counsel would discuss the existence of the videotape with the defendant in the course of preparing trial strategy. In fact, failure of counsel to do so may constitute ineffective assistance of counsel.
We therefore find merit in Penalver's claim that the trial court erred in allowing the State to present evidence about the witness talking with defense counsel and about the defendant meeting with his attorneys. Because the identification of the perpetrators of these murders was such a critical issue, the suggestion that the defense tampered with a witness takes on great significance.

III.

PRIOR CONSISTENT STATEMENTS
Penalver contends the trial court erred in admitting Detective Manzella's testimony regarding certain facts that Jean Klimeczko and Ian Milman told him regarding the weekend of the murders. Penalver argues the statements are inadmissible hearsay because they were offered for the truth of the matter asserted therein and do not come under any exception to the hearsay rule. The State counters that the statements are not hearsay because they were not offered for their truth, but rather to explain why Detective Manzella continued with his investigation. On direct examination, Detective Manzella testified that Klimeczko identified Penalver as the person in the photo taken from the videotape of the murder. During cross-examination, defense counsel asked Detective Manzella why he chose to believe Klimeczko since Klimeczko's version of events surrounding the night of the murder conflicted with Milman's version.
On redirect, the State attempted to establish that Klimeczko and Milman had made some statements that were consistent with each other. Defense counsel objected to this questioning, arguing that such testimony constituted inadmissible hearsay. The State countered that the evidence was admissible because defense counsel attacked Detective Manzella's methodology with respect to how he had conducted the investigation. The State argued that the prior consistent statements were admissible to explain why Detective Manzella accepted Klimeczko's statement. The trial court overruled the defense's objection and allowed the testimony.
We conclude that the trial court did not err in admitting this testimony because the testimony was not hearsay. Hearsay is defined in section 90.801(1)(c), Florida Statutes (2005), as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (Emphasis added.) See also Hernandez v. State, 863 So.2d 484 (Fla. *1132 4th DCA 2004). Thus, if the statement is offered for the truth of the facts contained in the statement, then the statement is hearsay and must fall within one of the recognized hearsay exceptions outlined in section 90.803 to be admitted into evidence. See Hutchinson v. State, 882 So.2d 943, 950-51 (Fla.2004). However, if the statement is offered for some purpose other than its truth, the statement is not hearsay and is generally admissible if relevant to a material issue in the case. See Harris v. State, 843 So.2d 856 (Fla.2003); State v. Baird, 572 So.2d 904 (Fla.1990).
In this instance, the statements were not offered to prove the truth of the facts contained in the statements. On cross-examination by the defense, Detective Manzella was questioned about his reliance on information obtained from Klimeczko which implicated the defendant. The defense indicated that Klimeczko should not be believed because his version of events conflicted with a version of events recited by Milman. On redirect, the State was allowed to elicit testimony from the detective concerning consistencies in the testimony of Klimeczko and Milman to negate the implied argument that the officer chose to believe someone who was not truthful. Thus, the statement was offered not to prove the truth but to demonstrate consistency. The trial court did not err in overruling the defendant's objection made on hearsay grounds. See Harris v. State, 843 So.2d 856, 861-62 (Fla.2003).

IV.

CONSCIOUSNESS OF GUILT
Penalver argues that the trial court erred in admitting evidence that Penalver refused to relinquish his shoes. He also argues that the trial court erred in admitting statements from Penalver to Munroe that Penalver threatened to commit suicide. The State argues that the evidence in both instances is relevant because it shows consciousness of guilt. Evidence shows that when the police first confronted Penalver with a warrant and requested his shoes, Penalver refused to relinquish them without a court order. After the officers explained that the warrant was a court order, Penalver continued to resist and his shoes had to be forcibly removed. Additionally, during the trial, Munroe testified that Penalver said something to the effect of "I might as well be dead" or "I want to kill myself." Munroe further testified that Penalver's comments were "just something he said in the moment" because he was very upset.
Penalver argues that the evidence regarding the relinquishment of his shoes does not demonstrate a consciousness of guilt. He also disputes that the evidence is relevant. With regard to the evidence of his statement to Munroe, Penalver argues that the statement does not amount to a threat to commit suicide. He contends that he made the comment because he was upset that his name appeared in a newspaper article about the murders.
It is within the sound discretion of the trial judge to determine the admissibility of evidence, and the trial judge's ruling on such an issue will not be disturbed on appeal absent a showing of an abuse of discretion. See Globe v. State, 877 So.2d 663 (Fla.2004); Johnston v. State, 863 So.2d 271 (Fla.2003); Zack v. State, 753 So.2d 9 (Fla.2000); Blanco v. State, 452 So.2d 520 (Fla.1984). Additionally, this Court has allowed the admission of evidence as relevant to consciousness of guilt where a suspect in any manner attempts to evade prosecution after a crime has been committed. See Straight v. State, 397 So.2d 903, 908 (Fla.1981). In this case, there was evidence of a distinctive shoe print at the scene of the crime. The police *1133 sought and obtained a search warrant that included Penalver's shoes as an item to be seized. While in jail and even after being read the warrant, Penalver continued to resist the seizure of his shoes.
Penalver argued he was resisting because he did not want to be in jail without his shoes. The State, on the other hand, argued that resisting the seizure was evidence of Penalver's consciousness of guilt. The fact that there were conflicting theories on the meaning to be attached to the evidence does not demonstrate that the trial judge abused his discretion in admitting the evidence. As we indicated in Huggins v. State, 889 So.2d 743, 755 (Fla. 2004), cert. denied, ___ U.S. ___, 125 S.Ct. 2546, 162 L.Ed.2d 280 (2005), the conflict in the theories goes to the weight to be accorded this evidence, not its admissibility. Because he has failed to show an abuse of discretion, Penalver is not entitled to relief on this issue.
This Court has not previously addressed whether threats of suicide or an attempt at suicide are admissible as evidence of consciousness of guilt. Two district courts have reached contrary conclusions when considering whether evidence of an attempted suicide was admissible as evidence of consciousness of guilt. In Walker v. State, 483 So.2d 791 (Fla. 1st DCA 1986), the defendant attempted suicide after he was questioned in a murder investigation. Under those circumstances, the First District found no error in the trial court giving the following instruction:
The attempted suicide of a person, after he is suspected of a crime, if proven beyond a reasonable doubt, may be considered by the jury as an indication of a desire to evade prosecution and one of a series of circumstances from which guilt may be inferred. You may find that the attempted suicide considered with other facts and circumstances is consistent with innocence. Evidence of attempted suicide and the significance to be attached to such evidence are matters exclusively within the province of the jury.
Id. at 796. Conversely, the Fifth District held that evidence of an attempt at suicide was inadmissible as evidence of consciousness of guilt because at the time the defendant attempted suicide, he pled guilty to the charges and was awaiting sentencing; thus, the attempted suicide "was not probative of flight from a pending prosecution." Meggison v. State, 540 So.2d 258, 259 (Fla. 5th DCA 1989).[6]
Three states have allowed evidence of a suicide threat as proof of consciousness of guilt. See People v. O'Neil, 18 Ill.2d 461, 165 N.E.2d 319, 321 (1960) (noting that the threat of suicide was similar to flight because it tended to show consciousness of guilt); Commonwealth v. Sanchez, 416 Pa.Super. 160, 610 A.2d 1020, 1028 (1992) (observing that "manifestations of mental distress tend to demonstrate a defendant's consciousness of guilt"); State v. Seffens, No. 01-C01-9107CR00190, 1992 WL 75831, *4 (Tenn.Crim.App. Mar.16, 1992) (finding evidence that defendant threatened to kill himself and his wife was admissible because some courts "have held this evidence is analogous to evidence of flight to show a consciousness of guilt").
With regard to other types of behavior that tend to show consciousness of guilt, this Court has stated that "[e]vidence that *1134 a suspected person in any manner endeavors to evade a threatened prosecution by any ex post facto indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions." Sireci v. State, 399 So.2d 964, 968 (Fla.1981). Under the standard set forth in Sireci, Penalver's threat to commit suicide was not an "endeavor to evade threatened prosecution" because at the time he made the threat, he was not under arrest and had not been threatened with prosecution. In the past, when this Court has addressed a criminal defendant's behavior as circumstantial evidence of consciousness of guilt, it has been in situations where the prosecution wants to introduce evidence that the suspect fled or took other actions to avoid arrest and prosecution; where the defendant disputes the relevance of such evidence, the State must adduce evidence that a reason for flight was to avoid being held accountable for the crime at issue. See Thomas v. State, 748 So.2d 970, 982 (Fla.1999); Escobar, 699 So.2d at 995 (holding that "there must be evidence which indicates a nexus between the flight. . . and the crime(s) for which the defendant is being tried in that specific case").
In this case, it is not clear that the statement made by Penalver was in fact a threat to commit suicide. Moreover, even if the statement is considered a threat, the fact that Penalver turned himself in tends to negate the argument that his threat was probative of a desire to avoid prosecution. Thus, we find that the court erred in admitting this evidence.

V.

WITNESS OPINION TESTIMONY
Penalver next argues that the trial court erred in admitting opinion testimony from Dr. Walter Birkby concerning identification of persons in photographs. Dr. Birkby testified that a person familiar with another person might be able to identify that person in a photograph under circumstances where a scientist could not make such an identification. Penalver argues this testimony was beyond Dr. Birkby's expertise. Dr. Birkby was allowed to testify as an expert in forensic anthropology with specialization in human identification. The qualification of a person as an expert is within the sound discretion of the trial judge. See Holland v. State, 773 So.2d 1065 (Fla.2000); Terry v. State, 668 So.2d 954 (Fla.1996). Once the witness has qualified as an expert, the trial judge also has broad discretion in determining the range of the subjects on which an expert can testify, and the trial judge's ruling will be upheld absent a clear error. See Pagan v. State, 830 So.2d 792 (Fla. 2002). No error has been demonstrated here because Dr. Birkby testified within his field of expertise on the subject of identification.

VI.

ADMISSION OF STATEMENTS BY JEAN KLIMECZKO
Penalver argues the trial court erred in admitting, over his objection, the out-of-court statement made by Jean Klimeczko concerning Penalver and Ibar's visit to the residence during the weekend of the murders.[7] The State, however, contends the statement was admissible because Klimeczko was an unavailable witness at trial pursuant to section 90.804(1)(c), Florida Statutes (1999). We agree with the State and affirm.
Section 90.804(1)(c) provides, in pertinent part, that a witness is unavailable if *1135 the witness "[h]as suffered a lack of memory of the subject matter of his or her statement so as to destroy the declarant's effectiveness as a witness during the trial." At trial, Klimeczko repeatedly stated that he could not remember making a statement to the police or testifying at the preliminary hearing. Klimeczko, in fact, appeared at the preliminary hearing, and Penalver was present at that hearing. Klimeczko was sworn as a witness, testified on direct examination by the State, and was cross-examined by the defendant. Thus, all of the requirements for admission of prior testimony were satisfied in this case. See Thompson v. State, 619 So.2d 261 (Fla.1993).

VII.

IDENTIFICATION OF PHOTOS BY MUNROE
Penalver also argues that the trial judge erred in admitting out-of-court statements made by Munroe that identified Penalver as one of the persons in a photo taken from a videotape of the crime.[8] The State counters that this issue is not preserved for appellate review because no objection was made at the time the testimony was presented, and that the statement was admissible as a prior inconsistent statement pursuant to section 90.801(2)(a), Florida Statutes (1999). We agree that the statement was admissible because it was not hearsay. Although it was a statement not made at the trial, it was made under oath at a grand jury proceeding, and it was inconsistent with Munroe's trial testimony. Furthermore, the record does not demonstrate that a claim of error was preserved for review. See Moore v. State, 452 So.2d 559, 561 (Fla.1984) (noting that a claim of error in admitting a prior inconsistent statement into evidence must be properly preserved for appellate review). Therefore, reversible error has not been demonstrated on this issue.

VIII.

ADMISSIBILITY OF STATEMENTS BY KIMBERLY SAN
Penalver next argues the trial judge erred in admitting the out-of-court statements made by Kimberly San that indicated Penalver was involved in the murders. Penalver also argues the trial court should not have overruled his objection to San's out-of-court statement concerning her reasons for coming forth with information about this case. We find the trial judge did not abuse his discretion in rulings on these issues. See Moore v. State, 701 So.2d 545 (Fla.1997) (noting that limitation on cross-examination is subject to abuse of discretion standard).
Defense counsel called Jasmine McMurtry as a witness. McMurtry lived with San's mother and had two children with San's brother. For a period of time when McMurtry lived with San's mother, San and Penalver lived there as well. Over the State's objection, McMurtry testified that she overheard San say that Penalver was not guilty. On cross-examination by the State, McMurtry also testified that she heard San say that Penalver was involved in the murders. The defense objected to this testimony. Thus, the matter of San's prior statements heard by this witness was introduced into the proceedings via the *1136 defense counsel's direct examination of the witness. The trial court acted within its discretion in allowing the State to bring in other testimony to "qualify, explain, or limit" testimony or evidence that had previously been admitted. See Rodriguez v. State, 753 So.2d 29, 42 (Fla.2000).
The issue of Kimberly San's motive for testifying was likewise introduced into this case by defense counsel during the direct examination of Detective Robert Lillie. Defense counsel questioned Detective Lillie about San's motive in coming forth in another murder case, and Detective Lillie admitted that San was interested in some type of leniency for her boyfriend. Thereafter, during cross-examination, the State made it clear that the testimony about wanting something for her boyfriend only pertained to San's information on another case. The trial court did not abuse its discretion in allowing the State to clarify the inference that San's motive in the instant case was also assistance for her boyfriend. See id.

IX.

FORMER TESTIMONY OF MARIA CASAS
Penalver's argument that the trial court erred in admitting the former testimony of Maria Casas has not been preserved for appellate review.[9] During the prior trial of this case, which resulted in a hung jury, Maria Casas, codefendant Ibar's mother, testified. Sometime after that testimony and the new trial, Casas died. Before the transcript of Casas' testimony was read at Penalver's second trial, defense counsel agreed to its admissibility. Thus, Penalver waived any objection to the argument now advanced.

X.

DEPOSITION OF HERSCHEL KINNAMAN AND ADMISSION OF AUDIO-TAPED PHONE CONVERSATION
As his final evidentiary issues, Penalver argues that the trial judge erred in not admitting into evidence the deposition of San's father, Herschel Kinnaman. Kinnaman, who knew Penalver, identified Penalver as the man in the videotape who took his disguise offthe man who was later identified as Ibar. The defense wanted to admit this deposition testimony to rebut Dr. Birkby's testimony offered by the State that a person who is familiar with another person can identify him or her in a photograph. Penalver also argues that the trial judge erred in failing to admit into evidence an answering machine tape made of victim Sucharski and his former girlfriend, Kristal Fisher. We find that the trial judge did not abuse his discretion in denying admission of this evidence.
This Court has repeatedly held that a deposition cannot be admitted in a criminal case as substantive evidence unless the requirements of Florida Rule of Criminal Procedure 3.190(j) have been satisfied. Rule 3.190(j) provides for the taking of depositions to perpetuate testimony to prevent a failure of justice. In this case, defense counsel filed a motion to perpetuate, and attempted to re-depose Kinnaman; however, Kinnaman died before the deposition to perpetuate testimony could be taken. Moreover, the discovery deposition was not admissible as nonhearsay because *1137 Kinnaman did not testify at trial and the testimony in the discovery deposition was not a statement of identification after perceiving a person. See § 90.801(2).
Additionally, the trial judge did not abuse his discretion in failing to admit into evidence the answering machine audiotape. Detective Manzella was permitted to testify that the tape contained an argument between Fisher and Sucharski. Fisher was called to testify, and defense counsel had the opportunity to use the statements she made on the audiotape to impeach her testimony at trial. Thus, any error in failing to admit the tape itself was harmless because the substance of the recording was admitted. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

XI.

CUMULATIVE ERROR
The State argues that even if the trial court erred in one or more of its evidentiary rulings, this Court should find admission of the evidence harmless. This Court has explained that the harmless error test "[p]laces the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). The commission of an error by the trial court is only considered harmless where there is no reasonable possibility that the error contributed to the verdict. See Walton v. State, 847 So.2d 438, 446 (Fla.2003). Moreover, even when we find multiple harmless errors, we must still consider whether "the cumulative effect of [the] errors was such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation." Brooks v. State, 918 So.2d 181, 202 (Fla. 2005) (quoting Jackson v. State, 575 So.2d 181, 189 (Fla.1991)). In assessing the cumulative effect of such errors, we have considered whether (1) the errors were fundamental, (2) the errors went to the heart of the State's case, and (3) the jury would still have heard substantial evidence in support of the defendant's guilt. Id.
In the instant case, the trial court erred in admitting evidence that tended to show that Alex Hernandez, a potential suspect, was out of the state at the time of the murders, thereby eliminating Hernandez as a possible perpetrator of these murders. The trial court also erroneously admitted evidence of a possible suicide threat by Penalver because the State argued the threat was evidence of Penalver's consciousness of guilt. Perhaps most significantly, however, the trial court erred in admitting evidence that tended to show that Munroe's testimony was influenced by her conversations with Penalver's counsel and in admitting jail records showing Penalver's visits with counsel. Based on the erroneous admission of this evidence, the State intimated that the defense tampered with a witness. These intimations were highly prejudicial to the defense. Not only did this improperly admitted evidence undermine Munroe's testimony at trial in which she stated that she could not identify the men in the videotape because of the tape's poor quality, but it also bolstered her prior identification of Penalver as one of the men in the tape. Moreover, the State's suggestion that defense counsel convinced Munroe to change her testimony without evidence to support that position undermined the credibility of the entire defense team as well as every defense witness presented. See Tindal v. State, 803 So.2d 806, 810 (Fla. 4th DCA 2001) (explaining that it is "impermissible for the state to suggest, without evidentiary support, *1138 that the defense has `gotten to' and changed a witness's testimony" because it improperly implies that prosecutor, who is agent of the state, has unique knowledge that has not been presented to the jury and that defense engaged in witness tampering or suborning perjury, both criminal offenses).
While the State presented circumstantial evidence regarding Penalver's involvement in the crime, only two pieces of direct evidence tying Penalver to the murders were presented: a photographic still taken from a grainy videotape depicting a person alleged to be Penalver who was attired in a cap and sunglasses that concealed his face; and a statement allegedly made by Penalver to another inmate that he had a chance of being acquitted because he did not remove his mask. In light of the scant evidence connecting Penalver to this murder and the consequent importance of identifying the individual depicted on the videotape in sunglasses and hat, we conclude that the improperly admitted evidence and the State's suggestion that the defense tampered with or suborned perjury by an identification witness meet the cumulative error requirements outlined above and require reversal. See Jackson v. State, 498 So.2d 906, 910 (Fla.1986) (finding that "combined prejudicial effect" of three evidentiary errors denied defendant fair trial and required reversal of his conviction; evidentiary errors included calling defendant's mother as court witness in order to admit otherwise inadmissible testimony of police officer under the guise of impeachment, allowing the State to impeach a defense witness by discussing details of the witness's previous conviction, and admitting the prior consistent statements of a prosecution witness in order to buttress the witness's credibility).
Accordingly, we conclude that Penalver was denied a fair trial by the prejudicial admission of irrelevant and inadmissible evidence repeatedly elicited by the State over appropriate objections by defense counsel. "While isolated incidents of [error] may or may not warrant a [reversal], in this case the cumulative effect of one impropriety after another was so overwhelming as to deprive" the defendant a fair trial. Nowitzke v. State, 572 So.2d 1346, 1350 (Fla.1990). Based on the record here, we cannot say that there is no reasonable possibility the errors cited by Penalver did not contribute to the guilty verdict.

CONCLUSION
Accordingly, for the reasons stated in this opinion we reverse Penalver's convictions and sentences and remand for a new trial.[10]
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, QUINCE, and CANTERO, JJ., concur.
WELLS, J., concurs in result only with an opinion.
BELL, J., concurs in result only.
WELLS, J., concurring in result only.
I concur in result only because I do not agree with the majority's opinion in regard to witness Milman's testimony being hearsay. Milman's testimony that Hernandez told him that Hernandez "intended to go to North Carolina" did not meet the definition of hearsay in section 90.801(1)(c). The statement was not offered to prove the *1139 truth of whether Hernandez "intended to go to North Carolina," which would have made it hearsay. Rather, the majority says that the Milman testimony was offered to prove that Hernandez went to North Carolina. Milman's statement was irrelevant as to whether Hernandez actually went to North Carolina, but it was not hearsay.
I make this point because I believe that the majority made a similar error in Brooks v. State, 787 So.2d 765 (Fla.2001).
NOTES
[1] Casmir Sucharski was also known as Butch Casey.
[2] The spelling of Jean Klimeczko's name appears in various ways throughout the parties' briefs in this case and in codefendant Ibar's case.
[3] Dr. Iscan is one of the forty board-certified forensic anthropologists in the nation; he teaches facial reconstruction and image analysis. Dr. Iscan has authored between 120 and 130 scientific articles and book chapters regarding the field of forensic anthropology. Dr. Iscan served as an expert in the Oklahoma City bombing case and the John Demjanjuk case in which Demjanjuk was accused of being the Nazi concentration camp guard Ivan the Terrible.
[4] The evidence present in Monlyn demonstrates that Monlyn in fact escaped from jail, stole clothing, money, and a shotgun from his uncle, beat the victim to death with the shotgun, and stole the victim's truck. See Monlyn v. State, 705 So.2d 1, 3 (Fla.1997).
[5] The gag order prohibited Roderman from discussing the fact that there was a video of the murders.
[6] To be admissible, evidence of flight after a crime has been committed must be relevant to consciousness of guilt that can be inferred from the circumstances of the case. See Escobar v. State, 699 So.2d 988, 995 (Fla.1997). The interpretation of an act of flight "should be made with a sensitivity to the facts of the particular case." Id. at 996 (quoting Bundy v. State, 471 So.2d 9, 21 (Fla.1985)). The abuse of discretion standard applies to relevancy decisions. See Williamson v. State, 681 So.2d 688, 696 (Fla.1996).
[7] This statement was made by Klimeczko at Penalver's adversarial preliminary hearing.
[8] This issue also included the admissibility of prior identification testimony by Klimeczko. Penalver has also included as a separate claim the issue of Klimeczko's statement of identification. The two separate issues concerning the identification of Penalver will not be further addressed because it is included in the preliminary hearing testimony of Klimeczko addressed in issue VI above.
[9] As a separate issue Penalver argues that Maria Casas, Melissa Munroe, Jean Klimeczko, and Ian Milman were all called as witnesses for the sole purpose of introducing otherwise inadmissible evidence. These arguments were never made to the trial judge and are likewise not preserved for appellate review.
[10] Because we find the trial court's rulings on several evidentiary points constitute reversible error, we decline to address the merits of the three claims concerning the imposition of sentences of death.