NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

DENNIS TAYLOR, DOC #R51908,            )
                                       )
        Appellant,            )
                                       )
v.                                     )      Case No. 2D16-5268
                                       )
STATE OF FLORIDA,                      )
                                       )
        Appellee.             )
_____)

Opinion filed September 21, 2018.

Appeal from the Circuit Court for Pasco
County; Susan G. Barthle, Judge.

Howard L. Dimmig, II, Public Defender,
and James Dickson Crock, Special
Assistant Public Defender, Bartow, for
Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Michael Schaub,
Assistant Attorney General, Tampa, for
Appellee.


ROTHSTEIN-YOUAKIM, Judge.

        A jury found Dennis Taylor guilty of robbery with a deadly weapon. See §

812.13(2)(a), Fla. Stat. (2014). Taylor now challenges his conviction, raising numerous

claims—some preserved, some unpreserved—of trial court error and prosecutorial

misconduct. We reject most of these claims without comment, but we agree with Taylor

that the trial court abused its discretion by allowing the prosecutor to repeatedly and improperly suggest to the jury that defense counsel had influenced the victim to change his story between the robbery and trial. And because we further agree that on this record, the error was not harmless, we reverse and remand for a new trial.

## Background

In the early evening of April 26, 2015, Taylor, apparently intoxicated, entered a convenience store in Pasco County, walked back to the cooler section, and began stuffing liquor bottles into his pockets. The clerk, Raif Bader, confronted Taylor; Taylor pulled an object from under his shirt, brandished it at Bader, and warned, "Don't you dare." Afraid, Bader returned to the front counter to retrieve his firearm. As Taylor walked out the door with one of the bottles, Bader "ordered him to drop his weapon, or whatever it was in his hand." Taylor did not drop the object. Security cameras recorded the incident.

Deputies later arrested Taylor in the yard of his house, which was approximately one-eighth of a mile from the store. Taylor had a liquor bottle in his hand and was intoxicated and belligerent. There were several other liquor bottles on the porch. Although the deputies looked along the route from the store to the house and around the yard, they found no knife or other weapon. They did not go into the house.

On the car ride to the jail, Taylor spontaneously volunteered to the lone deputy who was transporting him that he was going to jail for stealing a beer. Taylor also volunteered that he had had a knife while he was in the store. The deputy did not ask Taylor any questions, there was no video or audio recording of Taylor's statement,

- 2 -

and the deputy did not ask Taylor to write it down despite having a pen and paper in the car.

At trial, Bader testified on direct examination that Taylor had pulled "a—I don't want to say [a] knife, I would say it's a long spatula, as far as I know." Bader testified further, "As far as I remember, it had a round edge, round point, and it's—I wasn't thinking of a weapon at the time, I was perturbed but later on as far as I remember it, looked like just a spatula, so it was not a weapon." Bader testified that the object was "about a foot long."

The prosecutor asked Bader if he recalled providing a verbal and written statement to deputies right after the incident. Bader acknowledged that both verbally and in writing, he had indicated that the object in Taylor's hand had been a knife, explaining: "At that time—I wasn't concentrating on what he had in his hand, it was an object. I assumed it was a knife[.]" Immediately after that acknowledgment, the prosecutor asked Bader, "How many times have you talked to the defense attorneys since this happened?" And immediately after that, Taylor's counsel objected.

At sidebar, Taylor's counsel asserted that the prosecutor was "going to try to smear me as counsel." The prosecutor responded:

> No, this is impeachment. He's testified to something
> different than what he said, I'm impeaching my witness. I'm
> going to impeach him with the fact that he's spoken to these
> attorneys, including last night, and then all of a sudden this
> object has gone from a knife to a spatula. I think that's a fair
> comment. I think that's fair impeachment.

Acknowledging that "[i]t's completely fine for attorneys to talk to witnesses, there's a jury instruction that says that," the prosecutor continued:

But that's not what I'm offering it for. I'm offering it for impeachment, where all of a sudden he's talked to, he's talked to attorneys for the Defendant and now his testimony's changed from what he's previously stated.

The trial court excused the jury and heard additional argument, ultimately overruling Taylor's objection and concluding that the prosecutor's line of questioning was valid impeachment. The court then took a proffer of Bader's testimony, in which Bader proffered that he had spoken with defense counsel several times and that he had told defense counsel that the object had been about a foot long with a rounded edge and no point. Bader proffered further that the object had seemed "wobbly" and not "like a long piece of solid metal steel."

When the jury returned, the prosecutor picked up where he had left off, and the following exchange took place:

Q      Okay. How many times did you talk to the defense attorney?

A      Twice.

Q      Was one of those yesterday?

A      Monday, the day before.

Q      Okay, Monday. And when was the other time?

A      Two, three weeks ago, maybe.

Q      Okay. Is that the first time that you remember that this all of a sudden was a spatula instead of a knife?

A      No, no, no, from before.

Bader then explained that during the incident, he had thought that Taylor had a knife, which is what had prompted him to retrieve his firearm. Upon later reflection, however, he had thought that it would not make sense for Taylor to have had

- 4 -

a sharp object tucked into the front of his shirt because it would have cut him, "So that's what led me to believe . . . what I saw was actually the spatula, not a knife."

The prosecutor's next question was, "Has the Defendant's mom been down to the store to talk to you?" Taylor did not object. When Bader said that he had not spoken with her, the prosecutor continued, again without objection:

Q       Okay. But she's been down to the store?

A       She talked to another employee.

Q       About [Taylor's] case?

A       About [Taylor's] case, yeah.

On cross-examination, Bader reiterated that the tip of the object had been rounded off rather than sharp and that it would not have hurt anybody. He also testified that it had appeared "wobbly" to him rather than as a sharp piece of metal.

Both parties' closing arguments focused on whether the object in Taylor's hand had been a knife or a spatula. The prosecutor urged the jury to focus on the video and on Taylor's admission to the transporting deputy.

In response, defense counsel argued that the jury should rely on Bader's description of the object as something other than a knife. He also vigorously challenged the transporting deputy's testimony concerning Taylor's admission.

In rebuttal, the prosecutor attacked Bader's credibility regarding his inconsistent statements and again urged the jury to rely on the video, to which the prosecutor repeatedly referred as "the silent witness." In doing so, the prosecutor argued that the video was not "somehow impacted by the Defendant's mother coming to the store. It's not impacted all of a sudden after meeting with Defense counsel two

- 5 -

times, including yesterday where all of a sudden . . . ." At that point, defense counsel objected that the prosecutor was relying on facts not in evidence. Although the trial court sustained the objection to the extent that the evidence had established that Bader had spoken to counsel two days earlier, rather than on the previous day, it agreed with the prosecutor that the jury could rely on its own recollection concerning when Bader had reassessed the nature of the object in Taylor's hand. The prosecutor apologized that he had gotten "a little excited" but then continued:

> I'm sorry, Mr. Bader didn't say he talked to the defense attorney yesterday, he said he talked to him Monday, so excuse me. But he talked to him Monday, he talked to him a couple weeks ago, then all of a sudden, it's a spatula. It was a knife when he talked to [the responding deputy]; knife, knife, knife, knife, knife. When he wrote out the statement for [the responding deputy], knife. But now today after family's been by the store, you know, smile and wave everything's okay,[1] now it's just a spatula.

The prosecutor further argued, without objection:

> Mr. Bader . . . his story changes and you can determine from your notes, from your memory exactly when it changes from a knife to a spatula and why he would want to change that. Keep in mind, you know, he said he was visited by somebody from the Defendant's family. He wasn't there but another employee told him that.

> During deliberations, the jury asked to again view portions of the video in

which the object in Taylor's hand was visible. Thereafter, it returned its guilty verdict.

**Discussion**

---

[1]In his closing argument, defense counsel had pointed out that Bader and Taylor had "smiled and waved at each other" in the courtroom and had argued that this showed that Bader had no fear of Taylor.

The primary issue in dispute at trial was the nature of the object in Taylor's hand. Taylor argues that the trial court abused its discretion by allowing the prosecutor to repeatedly suggest through his questioning of Bader that defense counsel had somehow pressured or persuaded Bader to change his story and further abused its discretion by then allowing the prosecutor to reiterate that suggestion during closing argument. See Hayward v. State, 24 So. 3d 17, 29 (Fla. 2009) ("A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. The trial court's discretion is constrained, however, by the application of the rules of evidence and by the principles of stare decisis." (citations omitted)); Abdulla v. State, 223 So. 3d 276, 279 (Fla. 4th DCA 2017) ("Claims of improper closing arguments by a prosecutor are reviewed for an abuse of discretion.").

We agree. "Generally, comments by the State implying that the defense tampered with a witness without evidentiary support constitute reversible error." Penalver v. State, 926 So. 2d 1118, 1129 (Fla. 2006). In Penalver, the State had also persuaded the trial court that the jury should be permitted to draw an inference as to whether a witness who had changed her story "could have been influenced or affected by the conversations" with defense counsel. Id. at 1128. But the supreme court concluded otherwise:

> Evidence that [the witness] Munroe had conversations with Penalver's attorney is irrelevant because standing alone it does not support the argument that Munroe changed her testimony at trial based on these conversations. In fact, as Penalver contends, this entire line of questioning could have suggested to the jury that Penalver or his attorney exerted pressure on Munroe to change her testimony. Such a suggestion made without evidentiary support undermines one of the foundations on which our criminal justice system

is premised:  equal access by the State and the defense to witnesses.

Id. at 1130.  Here, the prosecutor told the trial court that the very purpose of his questioning was to impeach Bader by establishing that Bader's story had "suddenly" changed after Bader had met with defense counsel.  Under Penalver, this was plainly impermissible impeachment, and the court abused its discretion in allowing it.[2]

The trial court compounded the error by allowing the prosecutor to exploit this improper line of questioning during rebuttal closing argument.  There, the prosecutor continued to suggest that defense counsel had influenced Bader to change his story, despite Bader's unequivocal testimony that he had changed his mind about the nature of the object before any meeting with defense counsel and the State's utter failure to offer any evidence to indicate otherwise.  See Abdulla, 223 So. 3d at 280 (holding that prosecutor improperly implied "that the witness, through speaking with defense counsel and Appellant, came up with a defense strategy involving perjury," which could have been reasonably interpreted "as the prosecutor conveying to the jury that Appellant and his counsel were complicit in the witness's alleged perjury" (emphasis omitted)); see also Tindal v. State, 803 So. 2d 806, 810 (Fla. 4th DCA 2001) ("This court has repeatedly held that it is impermissible for the state to suggest, without evidentiary support, that the defense has 'gotten to' and changed a witness's testimony or that a witness has not testified out of fear." (citing Johnson v. State, 747 So. 2d 436,

_____

[2]We note that although Taylor relies heavily on Penalver and similar cases in his initial brief, the State's response brief fails to even mention, let alone distinguish, that line of caselaw.  Instead, the State supports its perfunctory assertion that the trial court did not abuse its discretion with references to a party's general right to inquire into a witness's possible biases.

439 (Fla. 4th DCA 1999); Henry v. State, 651 So. 2d 1267, 1268-69 (Fla. 4th DCA 1995))).

We cannot agree with the State's argument that these errors were harmless. In assessing whether an error was harmless, we ask if there is a reasonable possibility that the error affected the verdict, and it is the State's burden to establish that there is not. See State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). We do not merely evaluate whether the jury ultimately reached the correct result or whether overwhelming evidence of guilt exists. See Ventura v. State, 29 So. 3d 1086, 1090-91 (Fla. 2010). Rather, we must determine whether a reasonable possibility exists that the jury, in reaching its decision, considered the prosecutor's improper questions and argument regarding Bader's contact with defense counsel. See id. at 1090; Rigterink v. State, 2 So. 3d 221, 256 (Fla. 2009) ("Under a proper analysis, we conclude that the jury most assuredly, and very seriously, considered and substantially included Rigterink's videotaped interrogation in reaching its verdicts. . . . [U]nder these facts, we cannot say that the videotape—which should have been suppressed based upon proper legal analysis—did not 'contribute to' his convictions."), vacated on other grounds, Florida v. Rigterink, 559 U.S. 965 (2010). Our review "requires not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." DiGuilio, 491 So. 2d at 1138. Further, we must view the erroneously admitted evidence and improper argument together and in the context of the entire record. See Penalver, 926 So. 2d at 1137 ("[E]ven when we find multiple harmless errors, we must still consider whether 'the cumulative effect of [the]

errors was such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation.' " (second alteration in original) (quoting Brooks v. State, 918 So. 2d 181, 202 (Fla. 2005))).

The prosecutor's argument not only impermissibly impugned defense counsel's integrity but went so far as to imply that defense counsel had committed some form of witness tampering. See Howard v. State, 152 So. 3d 825, 829 (Fla. 2d DCA 2014) ("It is . . . improper to make any statement during closing argument that denigrates defense counsel or the defense strategy, including any comments made to suggest that the defense is attempting to perpetrate a fraud on the jury." (citation omitted)); Henry, 651 So. 2d at 1268 ("The implication by the prosecutor in this case was that the defense 'got to' the witness. That suggests that the defense was engaged in tampering with a witness and suborning perjury, both criminal offenses. Such a comment is highly irregular, impermissible, and prejudicial."). That the pertinent witness was the sole eyewitness to the charged offense made the implication all the more damaging.

Moreover, the prejudice of the improper suggestions was further compounded when the prosecutor also suggested through his questions and argument—again without any evidentiary foundation—that Taylor's mother had also somehow persuaded or pressured Bader to change his story.[3] By tying Bader's

_____

[3]Taylor did not object at trial to the prosecutor's questions or argument concerning his mother. We express no opinion as to whether they constituted fundamental error in themselves but consider them, and the rest of the record, as part of our harmlessness analysis of the error that we have already identified. See DiGuilio, 491 So. 2d at 1135 (explaining that the application of the harmless error analysis requires an examination of the entire record); see also Whitton v. State, 649 So. 2d 861, 864-65 (Fla. 1994) ("Although Whitton did not object to the first two alleged comments

- 10 -

changed story both to his conversations with defense counsel and to Taylor's mother's visit to the store—at some unspecified point in time after the robbery, when Bader had not even been at the store—the prosecutor improperly insinuated that he knew more than he was telling the jury. See Tindal, 803 So. 2d at 810 (explaining that "because the prosecutor is an agent of the state," comments suggesting that the defense has pressured a witness to change his testimony or to refuse to testify "imply that the prosecutor has unique knowledge that has not been presented to the jury").

In addition, we agree with Taylor that the prosecutor's comments impermissibly invited the jury to view Bader's prior inconsistent statements as substantive evidence. "Prior inconsistent statements are admissible for impeachment purposes so long as the goal is to have the jury 'disbelieve both statements' rather than to convince the jury 'that the prior statement is true and the in-court testimony is false.' " Abdulla, 223 So. 3d at 279 (quoting Espinoza v. State, 37 So. 3d 387, 388 (Fla. 4th DCA 2010)).[4] Here, however, although the prosecutor urged the jury to ultimately focus on the video from the security cameras, the obvious implication of his argument was that Bader's prior inconsistent statements were the truth, as the video was "the silent witness that's not somehow impacted by the Defendant's mother coming to the store. It's not impacted all of a sudden after meeting with Defense counsel two times . . . ."

Finally, the only evidence that could properly support a finding that the object was a knife was the video and Taylor's vigorously challenged statement to the

---

on Whitton's post-arrest silence, he argues that the cumulative impact of all three comments requires reversal. We agree that we must consider all three comments in our harmless error analysis because the harmless error test requires an examination of the entire record.").

[4]As in Abdulla, no exceptions to this general rule are pertinent to this case.

deputy. And contrary to the State's closing argument, the video is far from dispositive: all that can be discerned is a roughly foot-long, flat, and narrow object, the lower part of which appears to be a handle and the upper part of which appears to be a silver-colored metal, all of which could be consistent with either a knife or a metal spatula. The resolution is not high enough to establish whether the tip is pointed or rounded.

Especially given the paucity of the evidence, we cannot say that the jury did not consider the prosecutor's improper questioning and argument in ultimately finding that the object in Taylor's hand had been a knife. See Penalver, 926 So. 2d at 1138 ("In light of the scant evidence connecting Penalver to this murder [, i.e., a photograph from a grainy videotape and "a statement allegedly made by Penalver to another inmate that he had a chance of being acquitted because he did not remove his mask,"] and the consequent importance of identifying the individual depicted on the videotape in sunglasses and hat, we conclude that the improperly admitted evidence and the State's suggestion that the defense tampered with or suborned perjury by an identification witness meet the cumulative error requirements outlined above and require reversal."). We therefore cannot hold that the State has carried its burden of showing harmless error when the prosecutor persisted in improperly impeaching the only eyewitness, impugning the integrity of defense counsel, and further insinuating that defense counsel, as well as the defendant's mother, had committed criminal offenses of their own. Accordingly, we reverse and remand for a new trial.

Reversed; remanded.

NORTHCUTT and SALARIO, JJ., Concur.